589 F.2d 565
 191 U.S.App.D.C. 42
 C & H TRANSPORTATION CO., INC., Daily Express, Inc., &
Dallas & Mavis Forwarding Co., Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION & United States of America,
Respondents.
Ace Doran Hauling & Rigging Co., Home Transportation
Company, Inc., Aero Trucking, Inc., Miller's Motor
Freight, Inc., Wales Transportation,
Inc., J. H. Rose Truck Line,
Inc., et al., Intervenors.
 No. 77-1389.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 27, 1978.
Decided Oct. 10, 1978.
Rehearing Denied Oct. 31, 1978.
Certiorari Denied Feb. 21, 1979.
See 99 S.Ct. 1222.
 
 William A. Chesnutt, Washington, D. C., for petitioners.
 Carl E. Howe, Jr., Atty., Interstate Commerce Commission, Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, Interstate Commerce Commission, and James F. Ponsoldt, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 John P. McMahon, Columbus, Ohio, was on the brief for intervenor, Aero Trucking, Inc.
 James M. Doherty and Robert J. Birnbaum, Austin, Tex., were on the brief for intervenor, J. H. Rose Truck Line, Inc.
 
 
 1
 J. Michael Alexander, Salem, Or., was on the brief for intervenors, Wales Transportation, Inc. & H. J. Jeffries Truck Line, Inc.
 
 
 2
 Jeffrey Kohlman, Atlanta, Ga., was on the brief for intervenor, Home Transportation Company, Inc.
 
 
 3
 Jeremy Kahn and S. Harrison Kahn, Washington, D. C., entered appearances for intervenor, Miller's Motor Freight, Inc.
 
 
 4
 William A. Chesnutt, Washington, D. C., also entered an appearance for intervenor, Ace Doran Hauling & Rigging Co.
 
 
 5
 Carl D. Lawson and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.
 
 
 6
 Before DANAHER, Senior Circuit Judge, and TAMM and WILKEY, Circuit Judges.
 
 
 7
 Opinion for the court filed by TAMM, Circuit Judge.
 
 TAMM, Circuit Judge:
 
 8
 This appeal seeks to set aside orders of the Interstate Commerce Commission (Commission) authorizing a gateway elimination in conjunction with the grant of an application to purchase motor carrier authority. Because we find that a portion of the Commission's broad authorization is not supported by substantial evidence, we vacate the Commission's orders in part and remand for further proceedings.Background
 
 
 9
 Prior to 1974, the Commission permitted irregular-route motor carriers[1] holding two or more separate unrestricted grants of operating authority having a common point, or "gateway," to "tack," or join, those separate authorities. As long as the gateway was traversed, the carrier could provide through service between points contained in the separate authorities.[2]
 
 
 10
 Inefficient use of limited fuel resources resulted from the circuity frequently involved in tacking. In response to national concern for energy conservation, 41 Fed.Reg. 2459 (1976), the Commission revised its policy and promulgated restrictive tacking and gateway elimination rules. 49 C.F.R. § 1065 (1977).[3] The thrust of the policy is twofold to conserve diminishing resources by authorizing necessary service as directly as possible without unduly disrupting the competitive status quo. As relevant to this case, the rules prohibit tacking unless the applicant proves, in accordance with the standards of section 207 of the Interstate Commerce Act (Act), 49 U.S.C. § 307 (1970), that public convenience and necessity require through service.[4] If such a showing is made, the gateway is eliminated and direct authority is issued. 49 C.F.R. § 1065.1(b).
 
 
 11
 The requisite showing of public convenience and necessity may be made in either of two ways: (1) in the traditional manner, through public testimony that the proposed authority will fulfill public need which cannot be satisfied by existing service, and, in so doing, will not affect operations of other carriers in a manner contrary to the public interest, See Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936); or, in the absence of such evidence, (2) through proof that special gateway elimination criteria have been met. See F-B Truck Line Co., Extension Colorado/Utah, 128 M.C.C. 628, 635 (1978); Gray Moving & Storage, Inc. Purchase (Portion) Thomas C. Warner, 122 M.C.C. 316, 330 (1976). The gateway elimination criteria, first announced in Childress Elimination Sanford Gateway, 61 M.C.C. 421, 428 (1952), and found by the Commission to be applicable under the new rules in Ex parte No. 55 (Sub.-No. 8), Motor Common Carriers of Property, Routes & Service, 119 M.C.C. 530, 543, 550 (1974), require proof that:
 
 
 12
 (1) . . . applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers, and (2) . . . the elimination of the gateway requirement would (not) enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers.
 
 
 13
 61 M.C.C. at 428.
 
 Facts
 
 14
 In October 1974, Aero Trucking, Inc. (Aero), an intervenor in this appeal, filed an application under section 5(2) of the Act, 49 U.S.C.A. § 5(2) (1978),[5] for approval of the purchase of the Sub.-No. 33 operating rights of Miller's Motor Freight, Inc. (Miller's). Miller's was authorized to transport "size and weight"[6] commodities from points within ten miles of York, Pennsylvania, to all points in the United States, with several exceptions.[7] In connection with this application, on January 29, 1975, Aero sought, pursuant to section 207(a) of the Act, 49 U.S.C. § 307(a) (1970),[8] to combine Miller's authority with the authority it already held and to eliminate the resulting gateway at York. A grant of both applications would authorize Aero to provide direct-route service from points in the eighteen states[9] and the District of Columbia contained within its existing authority, to points in the thirty-nine states included in the authority it sought to acquire. Joint Appendix (J.A.) II at 845, 980.
 
 
 15
 Nine shippers supported Aero's applications;[10] thirteen carriers were in opposition.[11] Hearings were held before an administrative law judge (ALJ) in July and August, 1975. An initial decision, served on December 11, 1975, granted both applications. Id. at 844-71. On September 24, 1976, a three-Commissioner Division 3, in the main accepted the ALJ's decision, but modified slightly the territorial scope of the authority granted.[12] Petitions for further reconsideration were denied on February 24, 1977. Id. at 1029. Petitioners then sought review in this court of the Commission's grant of Aero's section 207 application.[13]
 
 Review of the Commission's Orders
 A. Scope of Review
 
 16
 The Administrative Procedure Act requires that the reviewing court set aside all agency action that is unsupported by substantial evidence in those cases subject to 5 U.S.C. §§ 556, 557 (1976). 5 U.S.C. § 706(2)(E) (1976). A section 207 application invokes the adjudicatory procedures of sections 556 and 557, See 5 U.S.C. § 558(c) (1976), and our review is therefore governed by the strictures of the substantial evidence test. We conclude that the major portion of the Commission's orders cannot withstand the scrutiny of this standard.
 
 
 17
 In so ruling, we are mindful of the restricted scope of our review and of the broad discretion traditionally lodged in the Commission when determining issues of public convenience and necessity. See United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535-36, 66 S.Ct. 687, 90 L.Ed. 821 (1946); ICC v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). Nonetheless, the Commission's discretion under section 207 is not limitless, See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), nor can it be shielded from "thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe,401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 18
 A careful review of the record shows that the proffered evidence is fatally deficient and will not support the award of direct-route authority between all of the jurisdictional origin and destination points encompassed within the Commission's orders. Aero submitted two traffic studies as well as public testimony in support of its application. The ALJ and thereafter Division 3 concluded that the studies satisfied the special gateway elimination criteria set forth in the Childress case, and that the testimony met the rigors of the traditional, and independent, public convenience and necessity test. J.A. II at 866-69. We find, however, that a substantial number of the more than 600 new direct-route authorities granted, See note 14 Infra, are without any evidentiary foundation there is no public testimony pertaining to them, nor are the Childress criteria met. We further find the evidentiary basis for many of the remaining authorities inadequate in more than one respect.
 
 B. Public Testimony
 
 19
 The ALJ concluded that the testimony presented by the nine supporting shippers demonstrated that public convenience and necessity required elimination of the gateway. J.A. II at 869. Review of the record reveals, however, that the evidence adduced through these witnesses falls far short of the "substantial evidence" necessary to uphold the Commission's orders in their entirety.
 
 
 20
 The geographic scope of the shippers' testimony is extremely limited. Of the nine shippers, three Jones & Laughlin Steel Corp., Id. at 852; Elwin J. Smith Division of Cyclops Corp., Id.; and Colt Industries, Crucible, Inc., Id. at 854 support Aero's application only insofar as it pertains to the shipment of commodities from Pennsylvania to North Carolina, South Carolina, Georgia, and Florida. Bethlehem Steel Corp., Id. at 851, expressed a need for transportation from Pennsylvania to these four destination states, and additionally to Alabama. Universal Cyclops Specialty Steel Division, Id. at 851-52, supports Aero's application as it relates to shipments from Pennsylvania and Ohio to North Carolina, South Carolina, Georgia, Florida, and Louisiana.
 
 
 21
 The remaining shippers claim a generalized need for national service. Of those four, Gibson Motor & Machine Service, Inc., Id. at 854, requires transportation only from a single point in Massachusetts; and Grove Manufacturing Co., Id. at 852, solely from one point in Pennsylvania. The testimony presented by Wheeling-Pittsburgh Steel Corp. and United States Steel Corp., while broader territorially, is still manifestly restricted. Wheeling-Pittsburgh Steel Corp. testified to a need for transportation from points in Pennsylvania, Ohio, and West Virginia to points throughout the nation. Id. at 853-54. United States Steel Corp. expressed a requirement for service from points in Illinois, Indiana, New Jersey, Ohio, and Pennsylvania to points throughout the United States. Id. at 855.
 
 
 22
 The testimony of these nine witnesses can be construed, at best, as favoring a grant of direct authority only between those states to which they specifically refer. This testimony cannot be read, however, as establishing a public need for service to and from all of the states authorized by the Commission.[14] See Pre-Fab Transit Co. Extension Alaska, 82 M.C.C. 72, 74 (1959).
 
 
 23
 The shippers' testimony is not only territorially restricted, but it is also substantively deficient in several respects. The elements necessary to establish public convenience and necessity in motor carrier operations are set out in Pan-American Bus Lines Operations, 1 M.C.C. at 203:
 
 
 24
 The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 25
 Satisfaction of this standard generally requires a showing that one or more shippers desire transportation of the type sought to be authorized and that their plans to use the service are reasonably definite. In this regard, shippers supporting an application for motor carrier authority must " 'identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing services.' " Novak Contract Carrier Application, 103 M.C.C. 555, 557 (1967). These are not merely "technical requirements," as characterized by the ALJ. See J.A. II at 869. Rather, they constitute, in the Commission's own words, "the minimal showing expected of any applicant seeking a grant of motor carrier authority," Novak Contract Carrier Application, 103 M.C.C. at 557, and are meant to assure that sufficient information will be available to determine the nature and extent of the transportation needs of the shippers. See Ashworth Transfer, Inc., Extension Explosives, 111 M.C.C. 860, 866 (1970).
 
 
 26
 By the ALJ's own admission, the testimony offered in this case was " somewhat general." J.A. II at 869. Several witnesses failed to identify the specific volumes of freight to be shipped through Aero to particular points.[15] United States Steel Corp., which claimed the broadest territorial needs, failed to express any dissatisfaction with the present carriers. Similarly, Elwin J. Smith Division of Cyclops Corp., Colt Industries, and Universal Cyclops Specialty Steel Division could not point to any inadequacies in existing service. The complaints asserted by the other shippers proved uniformly vague, undocumented, and insubstantial.[16] See Squaw Transit Co. v. United States, 574 F.2d 492, 494 (10th Cir. 1978); C. A. White Trucking Co. v. United States, 555 F.2d 1260, 1264-65 (5th Cir. 1977). We are constrained to note that the size of some of the shippers seems to have been more influential than their demonstrated needs. See J.A. II at 869. Such emphasis is misplaced and will not support a finding of public convenience and necessity sufficient to uphold the broad authorization granted by the Commission. See Ashworth Transfer, Inc., Extension Explosives, 111 M.C.C. at 865.
 
 
 27
 Analyzed in its entirety, the shippers' testimony can be construed only as demonstrating that public convenience and necessity require direct-route authority from points in Pennsylvania and Ohio to points in North Carolina, South Carolina, Florida, and Georgia. Seven of the nine[17] testified to a need for direct service between these states with adequate precision. Substantial evidence is found in the record to justify elimination of the York gateway with respect to transportation between these groups of states, and we accordingly affirm the Commission's orders to this extent. In the absence of public testimony sufficient to uphold the remainder of the award, we turn to an examination of the criteria set forth in the Childress case to determine whether the evidence contained in the record meets those tests.
 
 C. The Childress Criteria
 
 28
 The plain language of the first Childress criterion requires, at a minimum, that prior traffic have traveled Through the pertinent gateway. 61 M.C.C. at 428.
 
 
 29
 Of the two traffic studies offered by Aero, the first, and most important, consisted of an abstract of 2,224 shipments[18] which moved from some of the nineteen origin areas to some of the thirty-nine destination states by means of joint-line motor carrier services in which Aero was a participant during 1969-75. J.A. I at 68-131. Of these 2,224 shipments, over one-half moved between origin and destination points for which Aero already held direct single-line authority, See note 9 Supra ; and, therefore are not significant.
 
 
 30
 There is no evidence that Any of the shipments abstracted in the first study were interchanged at York, Pennsylvania, the only gateway relevant in these proceedings.[19] The ALJ, although quoting extensively from the Childress case, J.A. II at 867-68, and relying primarily on this study in determining that those criteria were satisfied, Id. at 868, failed to find that use was made of the gateway. The ALJ concluded only that there was "substantial interline activity on the part of (Aero) in the involved area and . . . that there was considerable demand for joint-line service into the area." Id. This will not satisfy the clear requirements of the first Childress test which demands actual utilization of the gateway. See Incorporated Carriers, Ltd. Gateway Elimination, 128 M.C.C. 810, 816 (1978); Interstate Motor Freight System Extension Moline, Ill., 125 M.C.C. 754, 761 (1976). To the extent that the Commission's orders rest on this study, they cannot be upheld.
 
 
 31
 The second traffic study considered by the ALJ abstracted 587 shipments transported by Aero from November 25, 1974, to June 30, 1975, under a temporary lease of Miller's authority. 49 U.S.C. § 310a(b) (1970); J.A. I at 144-73. Although most of these shipments passed through the York gateway, J.A. II at 850, they represent only some fifty of the over 600 new direct authorities awarded in this case. The study is thus manifestly deficient. As the Commission has explained, "it is not enough to show that between selected points applicant has transported substantial traffic," rather the proposing carrier must show that it is an "effective competitor as to substantially all points encompassed within the scope of its pertinent outstanding authority." Maryland Transportation Co. Extension Specified Commodities, 83 M.C.C. 451, 455 (1960). Traffic related to only some fifty pairs of origin and destination states cannot rationally support a finding of transportation between Substantially all of the over 600 new pairs encompassed within the scope of Aero's application.
 
 
 32
 Two further inadequacies preclude our finding this study sufficient justification for the Commission's orders either in whole or in part. First, the ALJ failed to determine whether the shipments made between designated points constituted "a substantial volume of traffic" through the gateway within the meaning of Childress. 61 M.C.C. at 428. About 400, or approximately sixty-eight percent, of the shipments abstracted moved from points in Pennsylvania and Ohio to points in North Carolina, South Carolina, Florida, and Georgia. We have already held the public testimony sufficient to justify elimination of the gateway with respect to these pairs of states. Only one or two shipments, however, were made between most of the remaining pairs of states. The finding of substantiality, crucial to any determination of compliance with Childress, becomes even more important when single and double shipments are involved. We therefore remand to the Commission for an explication of its substantiality criteria and a specific determination of whether the shipments abstracted in the second study meet those tests. See Burlington Truck Lines, Inc. v. United States, 371 U.S. at 167-68, 83 S.Ct. 239.
 
 
 33
 Second, the ALJ failed to analyze the effects of eliminating the gateway on Aero's competitive position. The second test set out in Childress requires proof that elimination of the gateway will not "enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers." 61 M.C.C. at 428. Mileage distances under present operations as compared with those proposed are to be considered in evaluating the effect on the competitive status quo. Id. In Childress, the Commission found that a mileage saving of twenty-three to twenty-nine percent where a one way movement was 300 miles or more constituted a new service. Id. Similarly, in Hermann Forwarding Co. Extension Pomona, N.J., 99 M.C.C. 476, 479-80 (1965), the Commission denied a gateway elimination application on the ground that a ninety-one mile reduction that enabled the carrier to provide same day service constituted a new service and altered the competitive balance. See, e. g., Overnite Transportation Co. Elimination of Gateway Monroe, N.C., 103 M.C.C. 135, 149-51 (1966); Chicago Express, Inc., Extension Tuscola, Ill., 79 M.C.C. 384, 385-86 (1959).
 
 
 34
 Enormous time and mileage savings will result from a complete grant of Aero's application.[20] Yet, the ALJ neglected even to address this issue. The ALJ's conclusory statement that the elimination of the gateway will not give rise to new service, J.A. II at 868, does not comport with the Commission's interpretation of the demands of the second Childress requirement.[21] On remand, the mileage savings encompassed within the grant of Aero's application must be reconciled with the criteria and analytic methods established in prior Commission decisions. Unfortunately, this court is again called upon to admonish the Commission that it must conform to its own precedents or explain its departure from them. See Greyhound Corp. v. ICC,179 U.S.App.D.C. 228, 230, 551 F.2d 414, 416 (1977) (per curiam).
 
 
 35
 Viewing the record as a whole, we are able to uphold the Commission's orders only insofar as they award direct-route authority from points in Pennsylvania and Ohio to points in North Carolina, South Carolina, Florida, and Georgia. The remaining direct-route authorizations sought by Aero are not supported by substantial evidence. Indeed, our analysis reveals that there is no mention anywhere in the record either in the traffic studies or in the witnesses' testimony of approximately 200 of the jurisdictional pairings authorized by the Commission.[22] Before concluding, however, a note concerning methodology is in order.Methodology
 
 
 36
 Respondents vigorously challenge the validity of an analysis based upon all possible origin and destination permutations and combinations encompassed within an award. See Joint Brief for the Commission and the United States of America at 21-22; Brief of Intervening Respondent Aero at 13-14. They argue that the sporadic nature of call-on-demand shipments of "size and weight" commodities renders unrealistic the requirement that evidence be offered pertinent to all states within a grant of authority. In effect, they contend that evidence supplied with respect to some of the states justifies elimination of the gateway and direct-route authorization as to all. Given the broad authority sought in this case, we cannot agree.
 
 
 37
 We are unpersuaded by the numerous cases cited by respondents in support of their proposition. These cases deal exclusively with proceedings under section 5(2) of the Act, 49 U.S.C.A. § 5(2) (1978), and are not dispositive in a section 207 inquiry. Section 5 requires that a carrier seeking to acquire the rights of another satisfy a "public interest" standard.[23]
 
 
 38
 A showing that adequately meets section 5(2), however, may not necessarily meet the more stringent requirements of section 207. Whereas section 5(2) only demands demonstration of "public interest," section 207 requires a showing of "public convenience and necessity." As this court has previously noted, the standard of public convenience and necessity is higher than that of public interest. Common Carrier Conference Irregular Route v. United States, 175 U.S.App.D.C. 244, 246, 534 F.2d 981, 983, Cert. denied,429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976). See J. V. McNicholas Transfer Co. Control Tom's Express, 122 M.C.C. 786, 792 (1977); Baggett Transportation Co. Purchase W. A. Bishop, 36 M.C.C. 659, 663-64 (1941); See also Refrigerated Transport, Co. v. ICC, 552 F.2d 1162, 1169 n.6 (5th Cir. 1977). Although atomization may be contrary to well-established precedent in motor carrier acquisition cases that is not to say the same applies in gateway elimination actions. The Commission has in the past uniformly applied, at the least, a state by state analysis of each proposed authority in gateway elimination cases, See, e. g., Central Transport, Inc. Purchase (Portion) Piedmont Petroleum Products, Inc., 127 M.C.C. 1, 22-23 (1977); Service Trucking Co., Extension Frozen Pies & Pastries, 88 M.C.C. 697, 701 (1962); Maryland Transportation Co., Extension Specified Commodities, 83 M.C.C. at 455, as we have recognized, See Youngstown Cartage Co. v. ICC, 187 U.S.App.D.C. 294, 295, 571 F.2d 1243, 1244, Cert. denied, --- U.S. ----, 99 S.Ct. 97, 58 L.Ed.2d 19 (1978) (No. 77-1651); Chem-Haulers, Inc. v. ICC, 184 U.S.App.D.C. 153, 156, 565 F.2d 728, 731 (1977). See also Squaw Transit Co. v. United States, 574 F.2d at 495; C. A. White Trucking Co. v. United States, 555 F.2d at 1264.
 
 
 39
 The Commission's recent decision in Groendyke Transport, Inc., Extension Gateway Elimination, 126 M.C.C. 571 (1977), fully supports our analysis. The Groendyke case is analogous to that presently before us. The application filed in that case, as in this, was "overbroad" in terms of the territories sought. Id. at 575. The Commission employed an analytic method identical to ours and reached a similar result, ruling that the entire gateway elimination was improper because "applicant ha(d) not shown that it ha(d) moved any traffic from and to many of the points sought." Id. at 575. In concluding that a "full grant of territorial authority was not warranted, particularly with respect to operations from (various states) from which . . . applicant handled only sporadic movements," Id. at 576, the Commission's decision is fully consistent with our conclusion here.
 
 
 40
 We are inclined to view the lack of evidence in this case, not as the result of the sporadic nature of the "size and weight" shipments, as respondents suggest, but rather as the manifestation of the operational and economic disabilities involved in gateway observance which have prevented Aero from effectively competing with petitioners. A grant of direct authority between points for which Aero has not actually transported traffic through the gateway and for which there is no public testimony demonstrating public convenience and necessity may result in an unjustified windfall to Aero, inconsistent with both the explicit standard of section 207 as well as the purpose of the gateway elimination rules. See text Supra at --- of 191 U.S.App.D.C., at 568 of 589 F.2d.
 
 Conclusion
 
 41
 In remanding this case, we recognize the wide latitude afforded the Commission in determining issues of public convenience and necessity. We do not undertake to substitute our judgment for theirs. Rather, our observations are intended to emphasize that the record, as supplied thus far, does not support the scope of the decision reached by Division 3. This is not a case going solely to an evaluation of the weight of the evidence, but instead, one that involves, in part, a complete lack of evidence in the particulars we have specified. While the record justifies a grant of direct authority from points in Pennsylvania and Ohio to points in North Carolina, South Carolina, Florida, and Georgia, it is plainly insufficient to support the remainder of the award. Accordingly, we vacate the orders under review insofar as they grant direct authority beyond that set out immediately above and remand the case to the Commission to conduct proceedings consistent with this opinion.
 
 
 42
 Vacated in part and remanded.
 
 
 
 [1]
 "Irregular-route" carriers are those authorized to operate between designated locations without restriction as to the route or highway to be traversed. Ex parte No. MC-10, Classification of Motor Carriers of Property, 2 M.C.C. 703, 709 (1937)
 
 
 [2]
 For example, a carrier authorized to go from point A to point B and from point B to point C could provide service from point A to point C as long as it passed through point B
 
 
 [3]
 The rules were adopted in Ex parte No. 55 (Sub.-No. 8), Motor Common Carriers of Property, Routes & Service, 119 M.C.C. 530 (1974), and upheld against attack in Thompson Van Lines, Inc. v. United States, 399 F.Supp. 1131 (D.D.C.1975), Aff'd mem., 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976), and Common Carrier Conference Irregular Route v. United States, 175 U.S.App.D.C. 244, 534 F.2d 981, Cert. denied, 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976)
 
 
 [4]
 These rules apply when the applicant already owns separate grants of authority and also when, as in this case, the applicant extends its authority by acquiring other existing route rights. Ex parte No. 55 (Sub.-No. 8), Motor Common Carriers of Property, Routes & Service, 119 M.C.C. at 552-53
 
 
 [5]
 49 U.S.C.A. § 5(2)(a) (1978) in pertinent part provides: "It shall be lawful, with the approval and authorization of the Commission . . . (i) . . . for any carrier . . . to purchase . . . the properties, or any part thereof, of another . . . ."
 
 
 [6]
 The "size and weight" commodity classification is a generic description for heavy and cumbersome articles
 
 
 [7]
 Those exceptions were Alaska, Hawaii, Connecticut, Delaware, Maryland, New Jersey, New York, Ohio, Pennsylvania, points in Virginia, points in West Virginia, and the District of Columbia. Joint Appendix (J.A.) I at 56
 
 
 [8]
 49 U.S.C. § 307(a) (1970) states that "a certificate shall be issued to any qualified applicant therefor . . . if it is found that . . . the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied."
 
 
 [9]
 Aero was authorized to serve all or some of the points in the following states: Ohio, Pennsylvania, New York, New Jersey, Virginia, West Virginia, Indiana, Illinois, Michigan, Wisconsin, Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont, Maine, Delaware, and Maryland. J.A. I at 57-63; J.A. II at 845
 
 
 [10]
 Bethlehem Steel Corp.; Universal Cyclops Specialty Steel Division; Jones & Laughlin Steel Corp.; Grove Manufacturing Co.; Elwin J. Smith Division of Cyclops Corp.; Wheeling-Pittsburgh Steel Corp.; Gibson Motor & Machine Service, Inc.; Colt Industries, Crucible, Inc.; and United States Steel Corp
 
 
 [11]
 Ace Doran Hauling & Rigging Co.; C & H Transportation Co., Inc.; Daily Express, Inc.; Dallas & Mavis Forwarding Co.; Hennis Freight Lines, Inc.; Home Transportation Co., Inc.; International Transport, Inc.; H. J. Jeffries Truck Line, Inc.; Mercury Motor Express, Inc.; Moss Trucking Co., Inc.; J. H. Rose Truck Line, Inc.; Vance Trucking Co.; and Wales Transportation, Inc. C & H Transportation Co., Inc.; Daily Express, Inc.; and Dallas & Mavis Forwarding Co. are petitioners in this court. Others of the opponent carriers are intervenors
 
 
 [12]
 The notice published in the Federal Register on April 4, 1975, 40 Fed.Reg. 15142, incorrectly included New York as a destination state and excluded Massachusetts and Vermont as origin states. J.A. II at 979-80. The modification was necessary to correct these errors
 
 
 [13]
 Petitioners do not challenge the Commission's orders authorizing the section 5 purchase of Miller's rights. They attack only those orders pertaining to the York, Pennsylvania gateway elimination
 
 
 [14]
 Of the 741 combinations of direct authority granted in the Commission's orders, Aero already holds authority for over 100. See J.A. II at 910-11. Of the some 600 new direct-route authorities granted, we can find no reference in the testimony of any of the witnesses to over one-third of these combinations:
 FROM points in Delaware, Maryland, Virginia, and the District of Columbia
 TO points in Arizona, Arkansas, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nevada, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Utah, and Wyoming;
 FROM points in Connecticut
 TO points in Alabama, Georgia, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, and Wyoming;
 FROM points in New Hampshire
 TO points in Alabama, Georgia, Idaho, Iowa, Kansas, Louisiana, Maine, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Vermont, and Wyoming;
 FROM points in Vermont
 TO points in Alabama, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, Wisconsin, and Wyoming;
 FROM points in Michigan
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming;
 FROM points in Wisconsin
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming;
 FROM points in Maine
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, and Wyoming;
 FROM points in Rhode Island
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, and Wyoming.
 We also note that Gibson Motor & Machine Service, Inc. testified to a need for transportation from Lawrence, Massachusetts. Id. at 854. This can hardly be construed as evidence of public need requiring authorization of direct-route travel from All points in Massachusetts as was granted.
 
 
 [15]
 United States Steel Corp., for example, submitted evidence of gross tonnage traveling from several origin points to the thirty-nine destination states. A detailed break down of the shipment figures was not offered, rendering it impossible to determine the quantum of traffic moving between the pertinent states. Id. at 855. The testimony of Bethlehem Steel Corp. and Universal Cyclops Speciality Steel Division suffers from similar deficiencies. Id. at 851
 
 
 [16]
 While we recognize that a finding of inadequacy of existing service is not always indispensable to the conclusion that the proposed service comports with public convenience and necessity, Cf. United States v. Dixie Highway Express, Inc., 389 U.S. 409, 411, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967) (per curiam), it is, nevertheless, an important factor in any section 207 determination and has been given considerable weight in gateway elimination cases. This factor warrants particular attention in view of the broad authorization sought by Aero and the imprecision of the testimony in general
 
 
 [17]
 Jones & Laughlin Steel Corp.; Edwin J. Smith Division of Cyclops Corp.; Colt Industries, Crucible, Inc.; Bethlehem Steel Corp.; Universal Cyclops Specialty Steel Division; Wheeling-Pittsburgh Steel Corp.; and United States Steel Corp
 
 
 [18]
 The administrative law judge based his analysis of this study on the incorrect conclusion that the study contained 2,242 shipments. J.A. II at 868. Eighteen numerical entries in the abstract, however, did not represent shipments that actually had been made. See entries 61, 156, 160, 217, 235, 251, 252, 267, 268, 272, 306, 308, 321, 323, 371, 391, 825, 827
 
 
 [19]
 Neither the Commission nor Aero contended, either in their brief or at oral argument, that the York gateway had in fact been traversed. We therefore accept petitioners' assertion that the traffic did not pass through the York gateway. Cf. Chem-Haulers, Inc. v. ICC, 184 U.S.App.D.C. 153, 155, 565 F.2d 728, 730 n.12 (1977)
 
 
 [20]
 The contesting carriers point out, for example, that the Commission's authorization of service from all points in Wisconsin to all points in thirty-nine states results in mileage reductions that vary from 46.48 to 63.49 percent; and elimination of the York gateway in trips from Chicago, Illinois entails as much as 70.44 percent circuity savings. Brief for Intervenor Petitioner Home Transportation Co., Inc. at 15
 
 
 [21]
 Evaluation may well show that elimination of the gateway with regard to some of the direct authorities represented in the second study is justified. Indeed, we note that the minimal circuity involved in shipments to several pairs of states abstracted in the study seem to indicate that elimination of the gateway will not disrupt existing competitive relations between carriers. We cannot, however, substitute our evaluation of this data for that of the Commission
 
 
 [22]
 FROM points in Virginia and the District of Columbia
 TO points in Arizona, Arkansas, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Wisconsin, and Wyoming;
 FROM points in Maryland
 TO points in Arizona, Arkansas, Illinois, Indiana, Kentucky, Maine, Massachusetts, Michigan, Mississippi, Montana, Nevada, New Hampshire, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Wisconsin, and Wyoming;
 FROM points in Delaware
 TO points in Arizona, Arkansas, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New York, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Wisconsin, and Wyoming;
 FROM points in Connecticut and Vermont
 TO points in Alabama, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, Wisconsin, and Wyoming;
 FROM points in New Hampshire
 TO points in Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, Wisconsin, and Wyoming;
 FROM points in Michigan
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, Wisconsin, and Wyoming;
 FROM points in Wisconsin
 TO points in Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, Wisconsin, and Wyoming.
 
 
 [23]
 In determining whether a transaction under this section is consistent with the public interest, the carrier must establish that the authority sought to be acquired is not dormant by demonstrating substantial service within the area authorized. The test of substantiality does not require a showing of service from every point contained within the authority. Shipment to a representative number of points within the area suffices to refute a dormancy challenge and justify a section 5 acquisition. Central Transport, Inc. Purchase (Portion) Piedmont Petroleum Products, Inc., 127 M.C.C. 1, 9-10 (1977)