**WHEATON VAN LINES, INC. and Global Van Lines, Inc., Petitioners,**

**Allied Van Lines, Inc., Intervenor,**

v.

**INTERSTATE COMMERCE COMMISSION and The United States of America, Respondents,**

**Barrieau Express, Inc. and Trans World Van Lines, Inc., Intervenors.**

No. 79–1716.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1980.

Decided Jan. 15, 1982.

Stanley I. Goldman, Washington, D. C., was on the brief for petitioners and intervening petitioner.

Dennis J. Starks, Atty., I. C. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Richard A. Allen, General Counsel, Frederick W. Read, III, Associate Gen. Counsel, I. C. C., Robert B. Nicholson, Asst. Chief, Appellate Section and Susan J. Atkinson, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents and for intervening respondents.

Before EDWARDS and GINSBURG, Circuit Judges and JOYCE HENS GREEN *, United States District Judge for the District of Columbia.

Opinion for the court filed by District Judge JOYCE HENS GREEN.

JOYCE HENS GREEN, District Judge:

This appeal by nationwide motor common carriers of household goods seeks to set aside orders of the Interstate Commerce Commission (Commission) granting the application of Barrieau Express, Inc. (Barrieau) to purchase dormant operating rights of a former small carrier[1] and, in conjunction therewith, authorizing a gateway elimination to allow Barrieau to provide direct service between the authority which it holds and that which it was purchasing.[2] Because the Commission has not provided a reasoned explanation for departing from its own past policy and practices in granting this broad authorization, we vacate the Commission's orders and remand for further proceedings.

Barrieau competes with the petitioners as a smaller regional motor carrier, its present authority allowing limited operations radiating primarily from and to the Northeast.

Its application to purchase for $25,000 the certificate of Trans World Van Lines, Inc. (Trans World), a former small Chicago-based carrier, was approved by the Commission, authorizing the transportation of household goods between Chicago and points within 50 miles thereof, on the one hand, and on the other, points in 33 states. Shortly after the filing of the purchase application, Barrieau proposed, by its extension application, to eliminate the need for observing the Chicago area gateway in joining its rights with those sought to be obtained from Trans World.

In order to acquire the operating authority of another carrier, the applicant must satisfy the requirement that the acquisition is "consistent with the public interest", pursuant to section 5(2) of the ICA. For gateway elimination, however, the stricter standard of section 207 applies, and the carrier must show that the service is required by public convenience and necessity.

The acquisition and gateway elimination issues will be addressed seriatim.

### 1. The Acquisition

■ The Commission predicated its conclusion that the transfer of operating authority would be consistent with the public interest upon the tripartite test established in *Central Transport, Inc.—Purchase (Portion)—Piedmont Petroleum*, 127 M.C.C. 1 (1977). First, the applicants must show that the public would benefit from the reactivation of dormant rights. If this showing is made, the protesting carriers then have the burden of demonstrating a probability of significant harm by the proposed transfer. If protestants carry this burden, then the applicants must show a shipper need for the service which will offset the harm to the protestants.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The purchase application was filed under former section 5(2) of the Interstate Commerce Act (ICA), now 49 U.S.C. §§ 11343 and 11344. Consistent with the Commission decision reviewed here, and the briefs, we refer to this provision as "section 5(2)" which, in pertinent part reads or states: "It shall be lawful, with

the approval and authorization of the Commission . . . (i) for any carrier . . . to purchase . . . the properties, or any part thereof, of another . . ."

2. The related extension application was filed pursuant to former section 207(a) of the ICA, now 49 U.S.C. § 10922. We refer to this provision as "section 207".

■ The Commission found that the involved rights were clearly dormant and, relying on *Jones Truck Lines, Inc.—Purchase—Deaton, Inc.*, 127 M.C.C. 428 (1978), that transfer of these rights would result in the creation of a new competitive service which could be judged by the same tripartite reasoning established in *Central.*

Unable to find a public benefit, the Administrative Law Judge (ALJ), recommended denial of the application. His determination included a finding that the operation would promote substantial deadheading (empty backhauls), involving inefficient operations and waste of fuel. Additionally, the Commission's Policy Statement on Operational Feasibility, 38 Fed.Reg. 32856 (1973), requires applicants to demonstrate avoidance of deadheading. Nevertheless, the Commission, failing to explain its departure from policy, merely agreed that some empty backhauls might be created by Barrieau's acquisition of the sought authority and dismissed this problem as "inherent in a household goods operation," 127 M.C.C. at 464.

Having determined that the public would receive a benefit from reactivation of dormant authority, the Commission next held that protestants had not met their burden under *Central* to show, by detailed evidence, a probability of significant harm. It concluded that they neither produced evidence of losses nor showed how Barrieau's relatively small operations could "reasonably impair any specific portions of the [protestants'] operations." *Id.*

The Commission rejected as unpersuasive the argument of petitioners that the paucity of Barrieau's business—85 shipments over 15 months under the temporary authority—curtailed their ability to collate the necessary evidence. It is not mere loss of business which constitutes the harm but sufficient loss to endanger the particular segment of protestants' operations, or its overall nature.

Noting, without elaboration, that increased competition, as here, with the "giants of the household goods industry", often fosters significantly better public service, the Commission concluded the proposed services would "mesh well" with Barrieau's existing operations and would promote "increased efficiency and economies of operation" by substituting direct for interline services. *Id.*

By unexplained departure from longstanding policy and by unexplained conclusions, the Commission approved sale of the dormant operating rights, apparently in anticipation of gateway elimination.

Whatever the rationale, it is evident that the Commission's terse decision suggests no probative basis for these bold conclusions and cannot be sustained on this record. Upon remand, as to those determinations relevant to acquisition of Trans World's operating authority, the Commission should not only provide a clear statement of the evidence it finds supportive of its reasoned conclusions but should also address whether those conclusions require a forecast that gateway elimination will occur.

### 2. The Gateway Elimination

While section 5(2) for an acquisition case is satisfied by a showing of "public interest" only, the gateway elimination action under section 207 of the ICA requires a demonstration of public convenience and necessity, a higher standard than that of public interest. *C & H Transportation Co., Inc., et al. v. Interstate Commerce Commission, et al.*, 589 F.2d 565, 576 (D.C.Cir.1978), *cert. denied*, 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979).

■ Prior to 1974, the Commission permitted motor carriers holding two or more grants of authority having a common point, or "gateway", to join ("tack") those separate authorities and provide through service. The gateway had to be crossed. Restrictive tacking and gateway elimination rules were subsequently promulgated by the Commission, 49 C.F.R. § 1065 (1977), in response to the inefficient use of fuel resources exacerbated by the resulting circuitous routes. The gateway will be eliminated only if the applicant proves, in accordance with the standards of section 207, that

public convenience and necessity requires through service. *C & H*, 589 F.2d at 569.

Public convenience and necessity may be proved by the traditional means of testimony of supporting shippers that the proposed authority will fulfill a public need not presently satisfied by existing service, and also, will not affect operations of others in a manner contrary to the public interest. Absent such conventional evidence, the applicant may prove that special gateway criteria—the *Childress* criteria (*see* pp. 424–425 *infra*)—have been met.

### A. *Public Testimony*

To support its grant of the applications, both as to acquisition and gateway elimination, the Commission alluded to the public testimony:

> The likelihood of improved, competitive transportation service in this case is buttressed by the eight supporting shippers which strongly praised the service available from Barrieau. Supporting shippers found this service excellent (under the temporary lease) and supported its continuance.
>
> \* \* \* \* \* \*
>
> Eight shippers with large, national household goods moving needs strongly supported the proposed service and indicated that little traffic would be diverted from protestants.

127 M.C.C. at 464, 466.

The ALJ's discussion makes clear that the scope of the shippers' testimony was broad and general for the most part and gave scant indication of their past or prospective use of Barrieau's services. J.A. at 28–31. Two illustrations will suffice. The Aetna Life and Casualty Company has used Barrieau's services under its own authority or as an agent for a larger carrier, "on about 80 shipments a year between points in states along the entire length of the east coast and as far west as Illinois. Because the service provided by Barrieau has been excellent, Aetna Life desires the availability of its direct service between points in the expanded territory . . ." J.A. at 28.

Connecticut General Life Insurance Company "has used the service provided by Barrieau as an agent . . . It supports the proposed extension of Barrieau's operation because of the excellent service provided by it . . .," J.A. at 29.

In short, without expressing specific detail, the shippers found Barrieau's service excellent, and would continue to use this as well as other carriers' services if the application were granted. At best, this testimony can be characterized as bland.

The deficiencies in the applicant's traditional proof are illuminated by failure of the Commission to consider established standards of proof, as set forth in *Pan American Bus Lines Operation*, 1 M.C.C. 190, 203 (1936), which require that shippers not only desire this type of transportation but that they have some definite plans to use it.

A minimal showing requires that the supporting shippers "identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing service." *Novak Contract Carrier Application*, 103 M.C.C. 555, 557 (1967).

The record here is hardly fortified by the shippers' testimony and cannot, in any event, rise to the level of substantial evidence as required to uphold the Commission's orders.

### B. *The Childress Criteria*

The criteria first enunciated in *Childress—Elimination Sanford Gateway*, 61 M.C.C. 421, 428 (1952), and consistently relied on by the Commission in subsequent cases, require proof that:

> (1) . . . applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers, and

(2) . . . the elimination of the gateway requirement would [not] enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers.

61 M.C.C. at 428.

The first *Childress* test demands substantial past traffic operations through the relevant gateway. As the Commission decided in *Groendyke Transport, Inc., Ext.—Gateway Elim.*, 126 M.C.C. 571 (1977):

A threshold question in any gateway elimination proceeding, then, is whether the applicant has transported a substantial amount of traffic through the pertinent gateway. To grant authority to and from points to which an applicant has not actually transported traffic would result in a windfall grant of authority neither contemplated by the rules, nor required by the public convenience and necessity . . .

126 M.C.C. at 574.

To realize the benefits from consummation of an approved purchase and yet enable the Commission to "assess the impact that a grant of direct authority would have upon the competitive structure along the direct route", the Commission has declared it will apply the *Childress* criteria flexibly to Section 5 related gateway elimination proposals. It has allowed, *inter alia*, considerations of prior interline operations between the vendor and the vendee through the gateway point. As stated in *J. V. McNicholas Transfer Co.—Control—Tom's Exp.*, 122 M.C.C. 786, 793–794 (1977) (*McNicholas I*), modified at 127 M.C.C. 309, 313 (1978) (*McNicholas II*):

In a related application context we should be careful not to work at cross purposes in the name of preserving the transportation system by finding under Section 5 that the transaction is consistent with the public interest and then declaring that the public convenience and necessity under 207 would not permit the transaction.

122 M.C.C. at 794.

*Childress*, as integrated into Commission decisions and approved by the court, requires, "at a minimum", actual utilization of the pertinent gateway by prior traffic of substantial volume, *C&H*, 589 F.2d at 573. In finding that Barrieau showed interline operations during 1975 between "its service area and that proposed to be acquired," the Commission provided no insight into how it reached this determination in the admitted absence of interlining between Barrieau and Trans World. Where there are no shipments routed through the gateway prior to temporary authority, there is no basis for gateway elimination. *Stevens Van Lines, Inc.—Control & Merger—Airline*, 127 M.C.C. 592, 599 (1979). If the Commission considered the Barrieau interline operations with carriers other than Trans World, as the Respondents' Brief avers, at 23, and as suggested by *Anderson Trucking Services, Inc.—Pur.—Bay*, 122 M.C.C. 673 (1977), it did not say so, nor did the Commission indicate its reliance on any evidence that Barrieau's shipments were interlined at Chicago, which fact would comport with the *Anderson Trucking* requirement that shipments with other carriers be routed through the pertinent gateway, 122 M.C.C. at 682–683.

Additionally, demonstration of substantial traffic between some selected points is insufficient. The applicant must show that it is an "effective competitor as to substantially all points encompassed within . . . its . . . authority", *Maryland Transportation Co. Extension—Specified Commodities*, 83 M.C.C. 451, 455 (1960). *See Groendyke*, 126 M.C.C. 571 (1971) where the gateway elimination grant was reversed in the absence of evidence that traffic moved between "substantially all" designated points encompassed in the authority.

In the past, the Commission has consistently applied a state by state analysis of each proposed authority in gateway elimination cases. In demanding this affirmative detail concerning which shipments were transported through which routes and gateways, the Commission has not hesitated to deny gateway eliminations when the applicant has failed its minimal burden.

Without this data the Commission is precluded from a reasoned analysis in ascertaining whether the applicant has been a substantial competitor for each of its requested authorities. *Youngstown Cartage Co. v. ICC*, 571 F.2d 1243, 1244 (D.C.Cir.) *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 119 (1978).

Nonetheless, without supportive findings, the Commission concluded that Barrieau had "shown evidence of past operation since 1975 moving between its service area" and the area to be acquired and had "continuing interline operations through the Chicago area during 1976" under its temporary authority. Yet, under the Commission's precedent, it was incumbent upon Barrieau to identify the traffic on which it relied, to explain how that movement and volume satisfied the *Childress* criterion of substantial past traffic through the pertinent gateway and to conduct a state by state analysis of that traffic to determine the substantiality of Barrieau's competition. The Commission's failure to do so and thereby follow its established tests provides us no reasoned basis on which to review its grants to Barrieau. *See Colonial Refrigerated Transp., Inc., Ext.—Gateway Elim.*, 131 M.C.C. 513, 521–522 (1979); *Chief Truck Lines, Inc.—Pur.—Murphy Transp., Inc.*, 127 M.C.C. 530, 540 (1979) and *Paramount Movers, Inc., Extension Gateway Elimination*, MC–31462, a 1980 decision. In each of these cases, and before making findings under the *Childress* criteria, the Commission conducted an analysis of the applicant's traffic exhibits, in consideration of the territory sought.

In *Paramount*, the Commission approved its Review Board's decision as "consistent" with *C & H* which held that under the Commission's gateway elimination rules, "[t]he Commission has in the past uniformly applied, at the very least, a state-by-state analysis of each proposed authority in gateway elimination cases ..." *C & H*, 589 F.2d at 576–577.

The second prong of the *Childress* test requires proof that elimination of the gateway will not "materially improve applicant's competitive position to the detriment of existing carriers." 61 M.C.C. at 428. A comparison and evaluation of present and prospective mileage distances are to be considered in assessing the effect on the competitive element. *Id.* This requirement also was not even addressed in the Commission's decision concerning Barrieau's application for gateway elimination.

Stating the absence of evidence of likely harm to result from either authority acquisition or gateway elimination and indicating that several shippers had "strongly supported" the proposed service which would cause little diversion of traffic from the protestants, the Commission found the proposed Chicago gateway elimination proposal proper "under Commission criteria laid out in the 'McNicholas' decisions." Those decisions, the Commission contends, "relax" the *Childress* criteria for approving gateway eliminations:

> The *McNicholas* decisions collectively state that a section 5 related gateway elimination proposal should be denied "only when the record clearly demonstrates that there will be significant adverse impact upon the competitive structure along the direct route." *McNicholas I*, 122 M.C.C. at 795.

127 M.C.C. at 466.

Yet, as earlier noted, the Commission's determination here is not supported by a discussion of the supporting witnesses' testimony in light of the geographic area involved. While there may be a need for service within this area, and although the competition of Barrieau may have scant effect on the "giants" of this industry, the fact remains the Commission presented no analysis of shipper needs. Without this foundation the Commission could not support its conclusion that there would be "no significant adverse impact upon the competitive structure."

Despite its muddled, uneven application of the traditional *Childress* criteria here, the Commission insists that those standards have not been eliminated and that it has "adhered to [*Childress'*] basic rationale and [evidentiary] requirements." It maintains that *McNicholas* promoted no more than "relaxation" of those criteria.

While there may be valid premises for the authorizations granted Barrieau by the Commission, as to both acquisition of Trans World's operation rights and gateway elimination, this record gives no such evidence. The Commission has simply failed to articulate a well-reasoned decision based on specific findings and analyzed conclusions to support its final determination. Evidence in some instances is barely discernable, in other particulars it appears nonexistent.

We recognize that the *Childress* test is but a method of proof, developed by the Commission to ascertain whether an applicant meets the statutory standard of public convenience and necessity. It may well be that abandonment of those restrictive burdens in favor of a more flexible approach as attempted here, will produce a direction of enhanced public benefit, with minimal impact on the competitors, through significantly improved public service as a result of the stimulation of competition.

The Commission claims it chose to apply *Childress* flexibly here. Instead, without clarification or renunciation, its actions have seemingly devitalized the *Childress* criteria. This court has stated that "[w]hile agencies may not be bound under the doctrine of *stare decisis* to the same degree as courts, ... it is at least incumbent upon the agency carefully to spell out the bases of its decision when departing from prior norms." *Food Marketing Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C.Cir.1978).

We are constrained to act in accordance with the scope of our review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), which requires the reviewing court to set aside all agency action that is unsupported by substantial evidence. Mindful of the principle of judicial restraint as it concerns the court's role in review of agency decisions, we nonetheless recognize that deference to an expert tribunal "cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

█ It is the court's function to assure that the agency has given reasoned consid-eration to the facts it has latitude to find, the conclusions drawn therefrom and the judgments it makes based on the record evidence. As said in *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 850 (D.C. Cir.1970), *cert. denied*, 403 U.S. 923, 92 S.Ct. 2223, 29 L.Ed.2d 701 (1971): "[T]he court must be satisfied that the agency's evidentiary fact findings are supported by substantial evidence, and provide rational support for the agency's inferences of ultimate fact."

█ Where, as here, an agency's view of what is in the public interest may involve a relaxation or alteration of its policies, or standards, it becomes particularly important that the agency demonstrate that it has "really taken a 'hard look' at the salient problems, and has ... genuinely engaged in reasoned decisionmaking." *Greater Boston Television*, 444 F.2d at 851. The agency's reflections based on supportable facts and conclusions must then promote equal application of the law.

As Judge Tamm said in *C & H*, 589 F.2d at 575:

> Unfortunately, this court is again called upon to admonish the Commission that it must conform to its own precedents or explain its departure from them.

It has been emphasized that change must be reached through reasoned decision and proclamation of choice:

> Judicial vigilance to enforce the Rule of Law in the administrative process is particularly called upon where, as here, the area under consideration is one wherein the Commission's policies are in flux. An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

*Greater Boston Television*, 444 F.2d at 852.

Upon remand for its reconsideration, the Commission can thoughtfully evaluate its

options in the light of invigorated reason: to adhere to past precedent enunciated in *Childress*, supplant it entirely in favor of the *McNicholas* standards, or adopt a wholly new approach. Should the Commission take any course other than retention of its *Childress* criteria, explication of its position and supporting reasons must be provided. Whether a new direction will promote positive results and improve public benefit remains for future determination.

The Commission's orders are therefore vacated, and the case remanded for further proceedings consistent with this opinion.