INTERNATIONAL DETECTIVE
SERVICE, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Wells Fargo Armored Service
Corporation, Intervenor.

PUROLATOR SECURITY, INC.,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Armored Transport, Inc., Intervenor.

INTERNATIONAL DETECTIVE
SERVICE, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Purolator Security, Inc., Brink's
Inc., Intervenors.

Nos. 78–1812, 78–2154 and 79–1045.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 20, 1979.

Decided Dec. 12, 1979.

Morris J. Levin, with whom Levin & Toomey, Washington, D. C., were on the brief, for petitioner in No. 78–1812 and No. 79–1045.

Peter A. Greene, Washington, D. C., with whom Norman J. Philion, III and Thompson, Hine, Caldwell & Greene, Washington, D. C., were on the brief, for Purolator Security, Inc.

H. Glenn Scammel, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Kenneth G. Caplan, Deputy Associate Counsel, I. C. C., John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Chief, Appellate Section, and Robert J. Wiggers, Atty., Antitrust Division, Dept. of Justice, Washington, D. C., were on the brief, for respondents in No. 78–1812.

H. Glenn Scammel, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Kenneth G. Caplan, Deputy Associate Gen. Counsel, I. C. C., John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Asst. Chief, Appellate Section, and J. Mark Manner, Atty., Antitrust Division, Dept. of Justice, Washington, D. C., were on the brief, for respondents in No. 79–1045.

Harry J. Jordan, David E. Wells, and MacDonald & McInerny, Washington, D. C., were on the brief for intervenor, Wells Fargo Armored Service Corporation, in No. 78–1812.

Theodore W. Russell, Robert W. Hancock, and Russell, Schureman & Hancock, Los Angeles, Cal., were on the brief for intervenor, Armored Transport, Inc., in No. 78–2154.

Chandler L. van Orman and Wheeler & Wheeler, Washington, D. C., were on the brief for intervenor Brink's Incorporated, in No. 79–1045.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

Opinion for the Court filed by Judge DAVIS.

DAVIS, Judge:

These three related motor carrier cases involve Interstate Commerce Commission decisions which reflect a new stress on the shipper's need for competition. In each case the ICC granted applications for contract carrier permits providing for new entry into routes served by the armored carrier industry. Not surprisingly the existing carriers in those fields have challenged the Commission. We conclude that the agency adequately considered the statutory provisions in approving these new motor contract carrier permits, and that the final policy choice in favor of increased competition was within administrative discretion.

The armored service segment of the motor carrier industry includes a limited number of firms [1] which provide the specialized handling, insurance requirements, and storage facilities for transporting high value commodities, including securities and money. A significant demand for such interstate transportation comes from the various Federal Reserve banks, which have traditionally undertaken to provide both member and nonmember banks in their regions with coin and currency.[2] The two Reserve

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. A recent ICC survey of the armored carrier industry estimated the total number of firms at 54, with the four largest companies (Brink's, Purolator, Wells Fargo and Loomis) controlling approximately 90% of the market. Interstate Commerce Commission, Initial Report of the Motor Carrier Task Force 129 (1979).

2. 31 C.F.R. § 100.2 (1978), requires the twelve regional banks to "make an equitable and impartial distribution of available supplies of cur-

Banks involved in these three cases, Boston and San Francisco, rely primarily on armored carriers to ship the currency, arranging for service on the basis of long-term contracts.[3] Both banks have desired and sought competitive bidding on their hauling contracts, but both have required that a bidder have prior certification by the ICC.[4] In Nos. 78–1812 and 79–1045, concerning the Boston Federal Reserve Bank, before the grant of the permits challenged here there was only one authorized carrier (Brink's) for most of the northeastern routes, with a second carrier (International Detective) authorized to make interstate deliveries in Connecticut and Rhode Island. In No. 78–2154, in which the San Francisco Reserve Bank was the shipper, there was only one authorized carrier, Purolator, for the Los Angeles to Arizona routes.

## I

The three cases considered in this opinion were handled by the Commission under its modified procedure which calls for decision on written submissions (including verified statements or affidavits) instead of an oral hearing involving testimony.

*Nos. 78–1812 and 79–1045:* The facts in these two cases are virtually identical. In both International Detective Service, a pre-existing common carrier in the area, attacks Commission motor contract carrier permits for Federal Reserve routes between Boston and various places in Connecticut and Rhode Island. In No. 78–1812 the Commission issued such a permit to Wells Fargo Armored Service Corporation ("Wells Fargo"); in No. 79–1045 a permit was granted for similar northeastern routes to Purolator Security, Inc. ("Purolator").[5] Each applicant set forth the usual data demonstrating its fitness and ability to serve as a contract carrier in the armored truck business. The Federal Reserve Bank of Boston served as the supporting shipper in both applications, avowing that increasing the number of certified carriers would provide more flexible schedules, more reliable service, and reduce costs. The Bank supported its prediction of reduced costs by citing evidence of lower costs (due to competitive bidding) on intrastate rates, where no ICC certification is required.[6] Much of the Bank's evidence for the need of more competition addressed the areas where Brink's had a monopoly. However, in aid of the Purolator application the

rency and coin in all cases directly to member banks of the Federal Reserve System and to nonmember commercial banks".

The importance of the Reserve Banks' business is demonstrated in the Commission's *Initial Report, supra* note 1, notation that the Federal Reserve is the largest single shipper, providing the largest carrier (Brink's) with 17% of its total revenues. Initial Report of the Motor Carrier Task Force 125 (1979).

3. The San Francisco Bank for its Los Angeles to Arizona routes had a 22-month contract; the Boston Bank on the Boston to Connecticut and Rhode Island routes (also involved here) had a one-year contract period. The San Francisco Bank's contract likewise contained a 60-day termination clause.

4. In No. 78–2154, the San Francisco Bank solicited and received bids from any carrier, but it awarded contracts only to carriers authorized by the ICC for interstate shipments. In Nos. 78–1812 and 79–1045, the Boston Bank required ICC authorization as a prerequisite to submission of a bid. This procedural difference in the banks' practices does not affect the end-result: only carriers with ICC authority

received and could receive contracts. *See* Part IV, D, *infra.*

5. The Commission granted Wells Fargo contract carrier authority for routes between Boston and Maine, New Hampshire, Vermont, Rhode Island and Connecticut. Purolator was granted a permit to operate on the Boston to Vermont, Connecticut, and New Hampshire routes. In both cases petitioner International Detective challenges only the parts of the authorizations directly affecting it—the Rhode Island and Connecticut extensions.

6. In its supporting statement for the Purolator application the Bank stated that in 1976 Brink's was dramatically underbid by both Wells Fargo (49% lower bids on average) and International Detective (42% lower bids). As a result of its lower bids for intrastate carrier service, Wells Fargo served the Bank on nineteen Massachusetts routes. Because the then-annual cost charged by Brink's for interstate service to Connecticut, New Hampshire, and Vermont was over $900,000, a parallel cost reduction due to competitive bids could result in substantial cost savings for the Bank (and indirectly the public).

Bank specifically mentioned the Boston to Connecticut situation where two carriers (Brink's and International Detective) were already authorized: "Even where two competitors are present the absence of additional competitors may lead to costs greater than they otherwise would be." The Bank bolstered its appeal for cost savings by noting that any surplus earned by the Bank is remitted to the U.S. Treasury.

International Detective, protesting both applications,[7] claimed before the Commission (as it does now in this court) that, whatever competitive deficiencies existed in areas of Brink's monopoly, they did not exist for the Connecticut and Rhode Island routes where International Detective served as a willing and able competitor. In both instances petitioner argued that granting the permit would "have severe detrimental affects [sic] upon International."

The Commission's decision on the Wells Fargo application (ultimately considered by the entire Commission) also governed the outcome of Purolator's application. In each case, after holding the applicant qualified as a contract carrier under the statutory definition, the Commission found the "central issue" was the balance between possible benefits to the shipper and carrier and possible harm to the protestants. *Wells Fargo Armored Service Corp., Extension—Boston, Mass.*, 129 M.C.C. 615, 617 (1978) [hereafter *Wells Fargo*]; *see Purolator Security, Inc., Extension—Three States*, No. MC–114896 (Sub-No. 49) (July 27, 1978) (unpublished opinion). The majority of the Commission struck the balance in favor of more competition, holding in *Wells Fargo*:

> The Federal Reserve Bank of Boston has been faced with a difficult situation. It desires to award transportation contracts on the basis of competitive bids. To bid on a contract, the carrier must have the proper contract carrier authority. If we preclude new entrants on the

ground that existing service is reasonably adequate, then the applicant cannot participate in the bidding. Thus a restrictive entry policy would frustrate the competitive bid process, and would not be in the public interest. Section 209(b) requires a balancing of the evidence in the light of its criteria, and we are convinced that in the long run the benefits accruing directly to the bank and ultimately to the public outweigh any detriments to protestants. Especially in an industry such as the armored car industry, which is not characterized by an abundance of qualified carriers, we should promote an environment for effective competition. 129 M.C.C. 615, 619 (1978).

The Commission came to the same conclusion in Purolator's application, citing *Wells Fargo*.

*No. 78–2154:* This case is essentially similar, bringing before us Purolator's challenge to a contract carrier permit awarded to Armored Transport, Inc. ("Armored") for contracts from the San Francisco Reserve Bank on its Los Angeles to Arizona routes. The Reserve Bank supported Armored's application, stating that although Armored had underbid Purolator by approximately $214,000 on these routes, the Bank was compelled to accept Purolator as the only certified interstate carrier.[8] The evidence of lack of competition was even stronger than in *Wells Fargo* because only one carrier (Purolator) had authority, as opposed to the two authorized carriers (Brink's and International Detective) on some of the *Wells Fargo* routes. Purolator protested the proposed new entry, challenging Armored's ability to handle the traffic at such a low cost and alleging that the loss of the Reserve business would "threaten the continued viability of PSI's [Purolator's] operations in California and Arizona . . . ." Division 2 of the Commission reconsidered Armored's application in the light of *Wells Fargo*, and concluded that that decision

---

7. Brink's also protested both applications before the Commission, and has intervened in support of petitioner International Detective in No. 79–1045.

8. Armored's bid was some 46% lower than Purolator's, a figure comparable to the 42–49% potential savings available to the Boston Bank through competitive bidding. *See supra*, note 6.

mandated approval of a new entrant here. *Armored Transport, Inc., Extension-Arizona*, No. MC–117072 (Sub-No. 4) (August 15, 1978) (unpublished opinion).[9]

## II

■ The essential issue in these three cases is whether the Commission could properly give as much weight as it did to the professed need of the Boston and San Francisco Reserve Banks for greater competition in the carriage for them of money and like valuables on regular Reserve Bank routes. Under the controlling statute such competition can undoubtedly be a significant factor. The two ultimate statutory criteria for granting contract carrier permits—the "public interest" and the National Transportation Policy [10]—both allow consideration of competition.

As the Supreme Court has told us (*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 297–99, 95 S.Ct. 438, 448, 42 L.Ed.2d 447 (1973)), the Commission can be congenial "to new entry and the resulting competition. This is the Commission's prerogative in carrying out its mandate to insure 'safe, adequate, economical, and efficient service,' National Transportation Policy, preceding 49 U.S.C. § 1. * * * It could conclude that the benefit of competitive service to consumers might outweigh the discomforts existing certificated carriers could feel as a result of new entry. Our decisions have dispelled any notion that the Commission's primary obligation is the protection of firms holding existing certificates. * * * A policy in favor of competition embodied in the laws has application in a variety of economic affairs. Even where Congress has chosen Government regulation as the primary device for protecting the public interest, a policy of facilitating competitive market structure and performance is entitled to

9. In the same decision Division 2 reconsidered and granted Purolator contract carrier authority to serve the Atlanta Federal Reserve Bank. This decision, also grounded on the general competitive considerations set forth in *Wells Fargo*, is not before the court. Although Purolator benefitted from part of the Commission decision (granting it the Atlanta extension), it now contests (in No. 78–2145) the same joint decision which granted Armored the Los Angeles area extension.

10. Section 209, as recodified, *see* 49 U.S.C.A. § 10923 (1979), conditions the grant of a contract carrier permit upon Commission findings that a person is "fit, willing, and able" to undertake shipping responsibilities and that the service will be consistent with "the public interest and the transportation policy of section 10101 of this title." 49 U.S.C.A. § 10923(a). In evaluating the applicant under these general standards, 49 U.S.C.A. § 10923(b)(2) [section 209(b) of the Motor Carrier Act] specifies:

(2) In deciding whether to approve the application of a person for a permit as a motor contract carrier, the Commission shall consider—

(A) the number of shippers to be served by the carrier;

(B) the nature of the transportation proposed to be provided;

(C) the effect that granting the permit would have on the transportation of carriers protesting the granting of the permit; and

(D) the effect that denying the permit would have on the person applying for the permit, its shippers, or both, and the changing character of the requirements of those shippers.

The National Transportation Policy, now contained in § 10101, enumerates the following considerations:

(a) To ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry.

consideration. * * * The Commission, of course, is entitled to conclude that preservation of a competitive structure in a given case is overridden by other interests [citation omitted], but where, as here, the Commission concludes that competition 'aids in the attainment of the objectives of the national transportation policy,' [citation omitted], we have no basis for disturbing the Commission's accommodation." [footnote omitted].[11] Indeed, so important is competition that this court overturned a Commission decision which "disregarded competition as a factor worthy of attention" and remanded "for consideration of the contribution that increased competition might make to the public weal." *P. C. White Truck Line, Inc. v. I. C. C.*, 179 U.S.App.D.C. 367, 369–70, 551 F.2d 1326, 1328–29 (1977).

Petitioners do not directly challenge this settled principle, focusing instead on arguments which seek to by-pass the fundamental role the Commission can properly give to

competition. But as will appear in Parts III and IV, *infra*, all of petitioner's sidewise attacks fail because the Commission's insistence on competition, though perhaps new in strength,[12] is within its legitimate authority and legally impregnable. Once the agency's deliberate discretion to adopt that approach is recognized—as it must be—petitioners' individual points do not survive our limited scope of review, whether expressed as the "substantial evidence on the record" standard or as "the arbitrary and capricious" standard, or both.[13]

### III

The first precise question before us is whether the applicants (Wells Fargo, Purolator, and Armored) were properly found to satisfy the statutory definition of a motor contract carrier. Section 203(a)(15) of the Motor Carrier Act defines a motor contract carrier as one serving either a single or "limited number" of persons and meeting the "distinct needs" of such person[s]. 49

11. *See, also, I. C. C. v. J–T Transp. Co.*, 368 U.S. 81, 92–93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961); *Illinois Central R. Co. v. Norfolk & Western R. Co.*, 385 U.S. 57, 68–69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966) (upholding railroad carrier applications when one of the benefits would be greater rail competition and lower rates); *United States v. Dixie Highway Express*, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967) (existing carriers have no property right in maintaining current routes); *Trans-American Van Service, Inc. v. United States*, 421 F.Supp. 308, 321–24 (N.D.Texas, 1976) (3-judge court) (competition is "strong and pervasive factor" to be considered by ICC in common carrier applications).

12. *See* Interstate Commerce Commission, Initial Report of the Motor Carrier Task Force 6 (1979) (reflecting recommended shift in Commission entry policies from "essentially protectionist" stance to position favoring market forces of competition); Interstate Commerce Commission, Improving Motor Carrier Entry Regulation: Report and Recommendations of a Staff Task Force 2 (some easing of entry controls is necessary). *See also,* Steinfeld, *Regulation versus Free Competition—The Current Battle Over Deregulation of Entry into the Motor Carrier Industry*, 45 ICC Practitioners' J. 590 (1978); Leland, *The Emergence of Competition as a Factor in Motor Common Carrier Licensing*, 46 ICC Practitioners' J. 56 (1978).

In the *Wells Fargo* application, the first of the three decisions, the full Commission reversed the Administrative Law Judge and the Review Board, and there were dissents by two of the commissioners.

13. The Court, in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), indicated that the "arbitrary, capricious" and "substantial evidence" standards were independent tests and both should be used in reviewing carrier applications. *Id.* at 283–84, 95 S.Ct. 438; *see Trans-American Van Service, Inc. v. United States*, 421 F.Supp. 308, 316–17 (N.D. Texas 1976) (3-judge court). *But cf. Illinois Central R. Co. v. Norfolk & Western R. Co.*, 385 U.S. 57, 65–66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966) (reviewing railroad common carrier application only under substantial evidence standard); *C & H Transp. Co. v. I. C. C.*, 191 U.S.App.D.C. 42, 47, 48, 589 F.2d 565, 570–71 (1978) ("substantial evidence" standard is appropriate for reviewing adjudicatory-type Commission proceedings). We need not explore the possible subtle differences between the two standards, because the Commission decisions here withstand scrutiny under both. *Cf. Packer Transp. Co. v. United States*, 596 F.2d 891, 894 & n. 4 (9th Cir. 1979) (discussing for standards, but applying only "substantial evidence" review). *See generally* K. Davis, Administrative Law of the Seventies § 29.00 (1976).

U.S.C.A. § 10102(12) (1979).[14] The Commission found that: "Armored carriers offer a unique and specialized service—transporting inherently valuable commodities and providing armored protective services in transit—which, if expressly or impliedly limited to a class of persons, satisfies both the 'limited number of persons' and 'distinct need' requirements of section 203(a)(15)." *Wells Fargo Armored Serv. Corp., Extension—Boston, Mass.*, 129 M.C.C. 615, 616–17 (1978) (citations omitted).[15]

Petitioners challenge these holdings on both criteria, but their points are largely foreclosed by our recent decision in *International Detective Service, Inc. v. I. C. C.*, 194 U.S.App.D.C. 55, 595 F.2d 862 (1979). That opinion involved an earlier challenge by International Detective to a contract carrier permit issued to Brink's for transportation of "precious metals" (which includes coins and currency).[16] The court reviewed the Commission's conclusion that Brink's armored service was a "highly specialized service" serving a "distinct need" of a "limited class of customers" and found it well supported by a long line of Commission precedent. *Id.* at 58–59, 595 F.2d at 865–66. Here, as in the prior *International Detective* case, the evidence sustains the special-

ized nature of the industry and the supporting shipper stated in each case before us that the applicant would meet the Bank's "distinct need" for flexible and economic transportation of coin and currency.

In its present case International Detective seeks to avoid the implications of the earlier decision against it by arguing that a Commission amendment eliminating a requirement for transportation "in armored vehicles, escorted by armed guards" vitiates the "limited number of persons" requirement. The Commission explained its deletion by stating that there might be cases when small shipments could be moved in non-armored cars and that there was "no good reason to restrict the flexibility of the service . . ." In the absence of evidence indicating that such an "armored vehicle, armed guard" restriction is a necessary part of the definition of the specialized armored transportation business we see no reason to reverse the Commission's determination on this point.[17]

International Detective's current argument that no "distinct need" was shown is also unavailing. The contention seems to be that this standard embodies a requirement that the applicant demonstrate it can provide "superior" or "distinctive"

---

14. Section 203(a)(15), now recodified (without substantive change) as section 10102(12), reads as follows:

> (12) "motor contract carrier" means a person, other than a motor common carrier, providing motor vehicle transportation for compensation under continuing agreements with a person or a limited number of persons—
> (A) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
> (B) designed to meet the distinct needs of each such person.

[49 U.S.C.A. § 10102(12) (1979).]

15. Substantially similar or identical language was used in both the Purolator extension (No. 79–1045) and the Armored extension (No. 78–2154).

16. Federal Reserve Bank routes were not specifically involved in that earlier case.

17. Petitioner asserts that the ICC "historically and traditionally" limits armored service carriers to those using armored cars with armed guards. However, the regulation cited in sup-

port of this historical definition simply states that the armored carrier group *includes* carriers of high-value commodities who use armored trucks and guards. The same regulation, 49 C.F.R. § 1040.2(j) (1978), also says that the armored carrier group " . . . also includes carriers which operate ordinary equipment in the carriage of high-value commodities when guards are necessary to accompany the shipment." This regulation does not at all support petitioner's interpretation that armored carriers must necessarily be limited to those using armored trucks with armed guards. *See Armored Carrier Corp. Extension-Vermont*, 102 M.C.C. 411 (1966) (granting contract carrier status to company carrying "cash letters"—various commercial documents other than coins or currency—between various commercial and central banks when carrier used slightly modified trucks with unarmed guards); *Bankers Dispatch Corp. Conversion Application*, 110 M.C.C. 294 (1969); *cf.* 49 U.S.C.A. § 10923(d) (1979) (giving the Commission discretion to set "necessary conditions" for contract carrier operation).

service and that no such showing was made, at least where competition between two existing carriers (Brink's and International Detective) existed in the Connecticut and Rhode Island areas. The answer is that "distinct need" relates to the shipper's own requirements and can be satisfied by its need for greater competition—physical availability is not the only component of "need." The Boston Bank stated that each applicant would provide greater flexibility and reliability of service and satisfy the need for economical service. The Bank supported this general assertion with evidence showing that competitive bidding (for intrastate or limited interstate carriage) with two or more authorized carriers produced prices some 42–49 percent lower than the prior monopoly carrier's rates. *See* note 6, *supra.* In the Purolator application the Bank specifically said that even where two carriers were authorized it was desirable to have more competing carriers to increase competition. On this evidence, even weighed with the fact that International Detective had provided substantial price reductions of 42 percent on its bids, we cannot overturn the Commission's findings of a "distinct need" on the part of the shipper. *See Illinois Central R. Co. v. Norfolk & Western R. Co., supra,* 385 U.S. at 68–69, 87 S.Ct. 255; *International Detective supra,* at 59, 595 F.2d at 866. It is not at all unreasonable to find that a shipper which can expect competition from a larger number of qualified carriers (leading, it is hoped, to lower prices and better service) will in the longer run find itself better off than one which is limited to only one or two carriers.[18]

International Detective's restrictive interpretation of the "distinct need" requirement could effectively preclude new carriers based on a shipper's need for competition. In cases such as these, where much of the shipper's special need is based on the presumed general advantages of competition, a "superior and distinctive" gloss on the "distinct need" requirement implies that each new entrant must show that it alone would in fact significantly reduce costs and improve competition. Where two authorized carriers exist (as in the Connecticut and Rhode Island routes in Nos. 78–1812 and 79–1045), to require a particularized showing that the addition of one new carrier would definitely improve competition might well be impossible. And even if that kind of proof might be available in some instances, the law does not compel the Commission to adopt so rigid a position. The Commission can properly rely on evidence showing that increased numbers of carriers will tend to provide lower prices and more flexible service. A general "policy in favor of competition" is open to the agency, if it wishes to adopt it. See, *Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc.,* quoted *supra,* Part II, 419 U.S. at 297–99, 95 S.Ct. 438.

▮ Neither the legislative history nor court rulings support International Detective's suggestion that a higher-level showing is required by the statute. The 1957 amendments, which added both section 203(a)(15) (note 14, *supra* ) and the factors contained in section 209(b) (note 10, *supra* ), were designed to resharpen the distinctions between contract and common carriers. The final legislation reflects a careful balancing between common carrier rights and expansion of contract carriers. In defining

18. In both Nos. 78–1812 and 79–1045 the Commission was aware that Connecticut and Rhode Island were served by two authorized carriers. In No. 79–1045, the Reserve Bank's supporting statement specifically addressed the two-firm situation, arguing that, in light of Brink's relatively fixed (and very high) price, the existence of only one other carrier did not guarantee competition. The second carrier could simply raise its prices to a near-monopoly level, undercut Brink's by only a small amount, and have the Bank at its mercy.

The existence of only two firms in an industry does not satisfy the general economic definition of pure competition, which requires the existence of many firms, no one of which has a significant influence on the market price. G. Bach, Economics: An Introduction to Analysis & Policy 289 (9th ed. 1977); *see* E. Chamberlin, The Theory of Monopolistic Competition 30–31 (7th ed. 1960) (describing 2-firm industry or "duopoly" as one type of a monopolistic industry).

a contract carrier under section 203 Congress specifically rejected language which would have limited such carriers to services "not provided by common carriers." Congress did not intend to insulate existing common carriers (such as International Detective) from potential contract carrier competition. See S.Rep.No.703, 85th Cong., 1st Sess. 5–7, reprinted in [1957] U.S.Code Cong. & Admin.News, pp. 1599, 1603–05; I.C.C. v. J–T Transport Co., 368 U.S. 81, 85–89, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961); Hudson Transit Lines, Inc. v. United States, 562 F.2d 174, 180 (2d Cir. 1977). After reviewing this legislative history the Court in J–T Transport, supra, found that the adequacy and ability of an existing carrier to serve normal needs did not end the inquiry. "The 'distinct need' of the shipper may nonetheless not be served by existing services, if the new service is better tailored to fit the special requirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired." Id. 368 U.S. at 92–93, 82 S.Ct. at 211 (emphasis added); see also, Bowman Transportation, supra 419 U.S. at 298, 95 S.Ct. at 448 ("Our decisions have dispelled any notion that the Commission's primary obligation is the protection of firms holding existing certificates.")

■ Purolator's assault in No. 78–2154 on Armored's qualifications as a contract carrier is similarly ineffective. The San Francisco Bank supported Armored's application, asked for more competition among carriers, and presented evidence that Armored's bid for the routes involved was some 46% lower than that of Purolator (the existing carrier for the routes). See note 8, supra. On this showing the Commission could reasonably find, as it did, that there was a need for competition and that it was not unlikely that competition would benefit the San Francisco Bank. Purolator complains that Armored did not back up its application by detailed explanation of how it would perform if it received the contract,[19] but there

was a sufficient showing by Armored, supported by the Bank which had long used the applicant on other routes, to allow the Commission to find that Armored would not be an unrealistic or unqualified contender for the routes. The permit proceeding is not to be turned into a full-fledged rate proceeding. I.C.C. v. J–T Transport Co., supra, 368 U.S. at 92, 82 S.Ct. 204 (1961). Nor can we determine the facts for ourselves, as Purolator seems to want us to do.

IV

■ Section 209 of the Motor Carrier Act (note 10, supra) sets out five factors that the Commission "shall consider" in evaluating motor contract carrier applications. These factors include: the number of shippers to be served, the nature of the proposed transportation, the effect a new permit would have on protesting carriers, the effect denying a permit would have on the applicant and/or shippers, and changing requirements of shippers. The specific elements are to be considered in the context of the ultimate standards for a contract carrier permit—the "public interest" and the National Transportation Policy (see note 10, supra).

Petitioners levy both procedural and substantive attacks connected with these specified factors. The procedural objection centers on the Commission's alleged failure to make adequate findings on the relevant elements.[20] The substantive contention is that the Commission had inadequate record support for the conclusions it reached, particularly in stressing the factor of the shippers' need for increased competition.

■ .A. It is important to recognize at once, in considering petitioners' points, that Congress did not compel the Commission to give equal or any numerical weight to any of the factors, but merely to consider them flexibly in reaching its determination. In J–T Transport, supra, the Supreme Court

---

19. Purolator claims that Armored's bid was artificially low and that the latter would be unable to perform.

20. It is common ground that all the factors are pertinent except for the fifth—"changing circumstances of the shipper."

stated that there was "no room for a presumption in favor of, or against, any of the five factors on which findings must be made under § 209(b)." 368 U.S. at 89, 82 S.Ct. at 209. This court and others have emphasized that the section 209 factors should be flexibly applied. *International Detective, supra* at 59, 595 F.2d at 866; *Baggett Transportation Co. v. United States,* 231 F.Supp. 905, 907 (N.D.Ala.1964) (3-judge court); *cf. Trans-American Van Service, Inc. v. United States,* 421 F.Supp. 308, 320 (N.D.Texas 1976) (3-judge court) (in weighing factors for granting common carrier certificate Commission must consider total circumstances, generally no one factor controls). *Secretary of Agriculture v. Central Roig Refining Co.,* 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950), analyzed a comparable statutory provision providing certain factors for the Secretary of Agriculture to consider in allocating sugar import quotas to individual refiners. Faced with a challenge to the Secretary's decision, Justice Frankfurter wrote for the court:

> Plainly these are not mechanical or self-defining standards. They in turn imply wide areas of judgment and therefore of discretion . . . Moreover, he [the Secretary] is under a duty merely to take "into consideration" the particularized factors. . . . Congress did not think it was feasible to bind the Secretary as to the part his "consideration" of these three factors should play in his final judgment—what weight each should be given, or whether in a particular situation all three factors must play a quantitative share in his computation. *Id.* at 611–12, 70 S.Ct. at 407.

This language equally applies to the Commission's consideration of the section 209(b) factors. So long as the Commission takes account of each of the relevant factors, it cannot be faulted simply because it gives more weight to one factor than another.

■ B. Although section 209(b) requires consideration of the factors, neither it nor the Administrative Procedure Act[21] re-

quires a detailed analysis of each and an explicit weighing of each against the other. The Commission's determination is adequate if logical processes in reaching that decision are reasonably discernible and the essential basic findings are revealed. *See Trans-American Van Service, Inc. v. United States,* 421 F.Supp. 308, 318–19 (N.D.Tex. 1976) (3-judge court). In a comparable context this court has held that it should uphold agency findings of "less than ideal clarity" if satisfied from the determination that the administrators gave a "hard look" at the relevant issues and if "the agency's path may reasonably be discerned." *See Greater Boston Television Corp. v. F.C.C.,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 71 (1971).

■ C. We are satisfied that the Commission did consider all the pertinent factors in each case but that it permissibly balanced them so as to favor the shippers' need for competition. In No. 78–1812, the first and leading case in this series, the agency's opinion explicitly adopted and reprinted (with minor modifications) the Administrative Law Judge's findings of fact, which summarized the evidence of protestants Brink's and International Detective on the effects of granting the new permit. *Wells Fargo, supra,* at 620–22. Short summaries of the effects on protesting carriers are also contained or expressly incorporated in Nos. 78–2154 (*Armored Transportation Extension*) and 79–1045 (*Purolator Extension*). In each instance the Commission stated the first two criteria (number of shippers and nature of service) and concluded that as a carrier providing "reliable and economical armored protective service" the applicant qualified as a contract carrier. The Commission then considered the two factors critical to these cases—effects on protesting carriers versus effects on applicants and shippers. After stating that reduced rates through competitive bidding were an important consideration to the shipper and that a restrictive entry policy

21. *See* 5 U.S.C. § 557(c)(3)(A) (1976) (requiring all adjudicatory-style agency decisions to con-

tain "findings and conclusions, and the reasons of basis therefor . . . .").

would frustrate competitive bidding, the agency concluded: "[W]e are convinced in the long run the benefits accruing directly to the bank and ultimately to the public outweigh any detriments to protestants," and that "Especially in an industry such as the armored car industry, which is not characterized by an abundance of qualified carriers, we should promote an environment for effective competition." *Wells Fargo, supra,* at 617–18. The reasoning of the Commission in the other two decisions substantially tracks that of *Wells Fargo.* In all three cases the agency's theory is clear— these shippers' need for greater and more effective competition is the most significant element in determining the public interest and adherence to the National Transportation Policy (once the applicants were found qualified as contract carriers).[22]

■ D. It was not arbitrary, capricious, or lacking support in substantial evidence for the Commission to reach these results. We have already pointed out in Part II, *supra,* that competition can be taken into account as a prime consideration, and in Part III (as well as earlier in this Part IV) that the Commission had a reasonable basis for believing that in these cases competition would be helpful to the Boston and San Francisco Reserve Banks. The weight to be given to this need for more effective competition was for the Commission to evaluate, not for us.[23]

Petitioner International Detective asserts that the drastic impact on it, the existing carrier, demanded that the balance swing against increased competition in Nos. 78–1812 and 79–1045. International Detective is said to be a small, financially limited company without other large operations to compensate for losses expected to be incurred if Wells Fargo and Purolator were to compete for the Boston Reserve Bank's Connecticut and Rhode Island routes. A sufficient difficulty with this point is that there is no convincing proof that this petitioner will suffer any undue losses. Granting Wells Fargo and Purolator permits does not necessarily, or even probably, lead to any severe loss of business for petitioner. The situation will then be that two additional carriers can bid on the Connecticut and Rhode Island routes, yet petitioner could still underbid all its competitors and receive the Bank's business. Moreover, the Boston Reserve Bank does not make blanket offers for all of its New England routes but limits offers to single routes. Thus, even if International Detective lost some business due to the presence of Wells Fargo and Purolator, it might still retain some of the routes and limit its losses.

Petitioner does not contradict these possibilities with any adequate showing that it would in fact be truly hurt. At least in the absence of a more definite demonstration of

---

**22.** Petitioners in Nos. 78–2154 and 79–1045 make much of the fact that in those cases the Commission adopted more summary opinions, invoking and relying on the earlier *Wells Fargo* opinion. We see nothing wrong in this practice which made clear that the agency was following a consistent policy in this line of cases—a policy which had been enunciated in *Wells Fargo.* The rationale of the later decisions is clear since all three cases are substantially the same, and the *Wells Fargo* decision covered the ground.

We emphasize that these are not cases where the Commission made no findings on some of the statutory factors. This distinguishes the present cases from *J–T Transport* or the recent decision in *C & H Transportation Co.,* in which the reviewing courts found a complete lack of consideration of certain factors. *J–T Transport, supra,* 368 U.S. at 89–90, 82 S.Ct. 204 (Commission used presumption in favor of existing carrier contrary to statutory factors); *C*

*& H Transportation Co. v. I.C.C.,* 191 U.S.App. D.C. 42, 54, 589 F.2d 565, 577 (1978) (remanding Commission decision where "complete lack of evidence" on certain issues), *cert. denied,* 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979).

**23.** Though the emphasis given to the factor of competition may have been somewhat greater than might be expected from past contract carrier cases (*see* note 12, *supra*) the Commission did not depart from, ignore, or reverse any of its precedents or any court ruling. Shifts in policy emphasis by a regulatory agency, within the bounds of its authorizing legislation, are permissible so long as it explains a real departure from prior precedents. *See Greyhound Corp. v. I.C.C.,* 179 U.S.App.D.C. 228, 230, 551 F.2d 414, 416 (1977); *Columbia Broadcasting System Inc. v. F.C.C.,* 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971).

the likelihood and magnitude of actual losses, we cannot conclude that the Commission erred in preferring an increase in competition for the shipper.[24] We need not forecast the result if it were plain on the record that the protesting carrier would be thrown out of business or severely damaged by a new entry. *Cf. Hilt Truck Line, Inc. v. United States*, 532 F.2d 1199, 1203–04 (8th Cir. 1976) (potential adverse impacts on existing carriers must be evaluated in larger context of public interest; adverse impacts on protestant alone insufficient to deny carrier certificate).

In No. 78–2154, petitioner Purolator urges that the Commission improperly ignored the way the San Francisco Reserve Bank lets its routes. Unlike the Boston Bank, the San Francisco institution allowed uncertified carriers to bid on its contracts (though the uncertified companies could not obtain a contract unless they secured certification). Curiously, Purolator urges strongly that this fact constitutes the critical difference between the ICC's San Francisco decision and the *Wells Fargo* extension in New England. But the decisive point is that, even if the San Francisco Bank allowed bidding by uncertified carriers, it would make offers only to authorized carriers. Purolator, like Brink's in parts of New England, was the only authorized interstate carrier and thus was guaranteed the San Francisco Bank's business, no matter how low an uncertified carrier might bid. Petitioner's suggestion that the Bank could support such a carrier's application for a permit, after receipt of a lower bid from it, would simply perpetuate Purolator's own monopoly for the months or years necessary to obtain Commission approval.

There would be in fact no competition for the contract which had to be awarded to Purolator as the only authorized company at the time.

For these reasons the Commission's decisions in all three cases are

*Affirmed.*

---

**24.** The same fallacy is contained in intervenor Brink's position. Brink's arrays a parade of fiscal horribles, including closing of offices and employee layoffs, all apparently based on a "worst case" hypothesis—that Brink's would be the losing bidder on all of the New England routes. We cannot lend credence to such a "worse case" assumption. In any event, Brink's is one of the largest companies in the armored carrier industry (*see* note 1, *supra*).

International Detective's fears of losing business to Wells Fargo and Purolator are perhaps grounded on its perception that the Boston

Federal Reserve prefers to deal with the larger, well-established armored carrier companies. The record does contain some inferences of such a preference by the Bank, and the administrative law judge in the Wells Fargo application was disturbed by the possibility of such preference. However, we cannot reverse the Commission on the basis of a protesting carrier's perceptions of Federal Reserve bias and its flawed economic arguments resting on that perception. We can, however, hope that such concerns (to the extent they are valid) will not be lost on the responsible Bank officials.